(Not for publication)                                    Docket Entry No.  9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                                        :
JUDY COHEN,                             :
                                        :
                    Plaintiff,          :        Civil No. 04-5077 (RBK)
                                        :
        v.                              :
                                        :
JOANNE B. BARNHARDT,                    :
Commissioner of Social Security,        :
                                        :
                    Defendant.          :
_____:

## <u>OPINION</u>

**KUGLER**, United States District Judge:

    Before the Court is an appeal by Judy Cohen from the final decision of Defendant,
JoAnne B. Barnhart, Commissioner of Social Security, denying disability benefits.
Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review final decisions of the
Commissioner of Social Security.  Cohen seeks benefits under Title II of the Social
Security Act.

## I.  Standard of Review

    The Social Security Act provides for judicial review of a "final decision of the
Commissioner of Social Security" in a disability proceeding. 42 U.S.C. § 405(g).  The
district court may enter a judgment "affirming, modifying, or reversing the decision of the

Commissioner of Social Security, with or without remanding the cause for a rehearing."
Id.

However, the Commissioner's findings of fact shall be conclusive if they are supported by substantial evidence.  Id.  "Substantial evidence" means that a reasonable mind could accept that the relevant evidence, taken as a whole, was adequate to support the conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  Nevertheless, a single piece of evidence does not constitute substantial evidence if the Commissioner ignores or fails to resolve a conflict created by contradictory evidence.  Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).  Likewise, evidence is not substantial if it is overwhelmed by other evidence--particularly certain types of evidence such as the opinions of treating physicians--or if it really constitutes not evidence, but mere conclusion.  Id.

The ALJ's findings of law, by contrast, are subject to plenary review.  See Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir.1990); Podedworny v. Harris, 745 F.2d 210, 221 n. 8 (3d Cir.1984).  Accordingly, the Court must determine whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact.  See Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999).

## II.  Factual Background

Judy Cohen's current claim of disability stems from injuries she sustained when she was struck by a car while riding her bicycle on June 24, 1978.  (Tr. at 17, 140.)  The collision caused physical trauma to the left side of Ms. Cohen's body.  (Tr. at 17, 134.)

Although she did not lose consciousness at the time of the accident, Ms. Cohen sustained

multiple injuries on her left forearm, contusions and lacerations of her left rib cage, neck,

left shoulder, and dorsal and lumbar spine.  (Tr. at 134.)

     In the years following the accident, Ms. Cohen sought various kinds of treatment

for her physical injuries.  Dr. K.H. Maurer, M.D., diagnosed Ms. Cohen with

fibromyalgia after treating her on March 19, 1984 and April 6, 1984.  (Tr. at 17, 156-57).

Ms. Cohen's symptoms included burning sensations, muscle aches, and an unbearable

feeling like her whole body was twisted.  (Tr. at 17, 156.)   After the accident, Ms. Cohen

also tried chiropractic care and acupuncture, neither of which provided her with relief.

(Tr. at 176-77, 405).  A chiropractic report from September 1980 states that her principle

pain was in her low back area radiating into her left buttocks and in her neck on her left

side radiating into her left shoulder down to the level of her hand.  (Tr. at 172.)  The

report, written by Dr. William Bromley, D.C., indicates that these pains had been

persistent since the accident on June 24, 1978, and states that "the patient currently is

totally disabled and is unable to be employed because of her back condition."  (Tr. at

172.)  In 2000, Ms. Cohen received treatment from Healing Partnerships Physical

Therapy but the treatment was discontinued because it seemed to make her pain worse.

(Tr. at 202.)

     In addition to her treatment for physical problems, the claimant also sought

treatment for mental impairments in the years after her accident.  On January 6, 1981,

psychiatrist Gerald Margolis, M.D., diagnosed Ms. Cohen with neurotic depressive

disorder with anxiety attacks.  (Tr. at 17, 161.)  He stated that she had a progressively

worsening depression that was affecting her daily activities.  (Tr. at 17, 27.)  Specifically,

she experienced driving phobias and anxiety attacks pertaining to being hit by an

automobile. (Tr. at 161.)  She also experienced symptoms of severe insomnia, anorexia,

weight loss, considerable crying, anhedonia, despair over her inability to use her body,

lowered self-esteem, shame and guilt, difficulty with concentration, suicidal ideations,

and she was no longer able to function in a work setting or maintain her social life.  (Tr.

at 18, 27, 161.)   In a letter dated June 6, 1981, Dr. Margolis indicated that the claimant

was to continue in psychotherapy treatment four times a week.  (Tr. at 17, 160.)  During

this time, she was not prescribed any medications for her psychiatric problems[1] and Dr.

Margolis reported that she was making progress and offered a prognosis of "favorable

with adequate treatment."  (Tr. at 18, 162.)  However, in January 1981, he stated that "it

would be very difficult for her to return to work at this time" and in July 1981, he noted

that Ms. Cohen was "unable to perform the duties of a teacher." (Tr. at 161, 159.)

Although Ms. Cohen continued in treatment with Dr. Margolis for many years, most of

the medical records from his office for the relevant time period have been destroyed or

are otherwise missing from the record.  (See Pl. Mem. at 24.)

Another psychiatrist, Dr. Arnold Goldman, M.D., had been treating Ms. Cohen

twice a week since July 21, 1993.  (Tr. at 345).  His reports indicated that she had very

limited daily activities because of  her mental and physical impairments. (Tr. at 345-47.)

---

[1] The claimant's subsequent treating physician has reported that the reason why Ms. Cohen was not on medication for her mental impairments at this time was because Dr. Margolis feared that such medication might interfere with her "therapeutic work." (See Tr. at 345.)

Dr. Goldman also noted that Ms. Cohen's physical pain rendered her unable to sustain any activity for more than 20-30 minutes and she has trouble sitting, standing or bending for more than 5-10 minutes. (Tr. at 347.)

Although Dr. Goldman began treating Ms. Cohen several years after the date she was last insured for disability benefits, Dr. Goldman made a retrospective assessment of Ms. Cohen's ability to do work-related activities for periods on or before March 31, 1985 (date last insured). (Tr. at 349-52.) Dr. Goldman consulted Dr. Margolis in creating the assessment, and in the report he notes that during the relevant time period, Ms. Cohen had serious limitations in many areas relating to occupational, performance, and personal-social adjustments. (Tr. at 349-52.) The report states that Ms. Cohen's illness had been "refractory to any medication to date." (Tr. at 350.) It also notes that Dr. Margolis verbally indicated to Dr. Goldman that from September 1979 to December 1988 Ms. Cohen's depression "seemed to not improve despite interpretation" and "she was never able to work during that time." (Tr. at 351.)

In March of 1996, Ms. Cohen began seeing Willa M. Greenberg, D.O., at the Cooper Hospital/University Medical Center. (Tr. at 342.) In March 2000, Dr. Greenberg reported that Ms. Cohen was extremely depressed and that she had been suffering for over 20 years with chronic pain syndrome. (Tr. at 340.) Specifically, Dr. Greenberg noted that Ms. Cohen has had severe symptoms of fibromyalgia, including poor sleeping habits with frequent awakening, severe daytime fatigue and musculoskeletal pain that is all over her body, described as tight, burning and knife-like. (Tr. at 342.) Dr. Greenberg also noted that Ms. Cohen has had multiple trials of different medications with significant

side effects, as well as highly sensitive reactions.  (Tr. at 340.)  As a result of the

claimant's severe fibromyalgia, Dr. Greenberg concluded that Ms. Cohen has been unable

to work since her bicycle accident in June of 1978.  (Tr. at 342.)

In addition to the treating physicians' records and opinions, Dr. Richard Cohen,

M.D., served as a testifying medical expert and reviewed the relevant medical records to

assess Ms. Cohen's condition.  (Tr. at 379.)  Upon review of these records, Dr. Cohen

testified that he believed Ms. Cohen had a major depressive disorder in the relevant

period of time with anhedonia, sleep disturbance, appetite disturbance, energy

disturbance, decreased self-esteem and guilt, and suicide ideations and decreased

concentration. (Tr. at 379.)   He indicated that given these diagnoses, the stress of

working might cause her to decompensate, but he could not give an exact period of time

that the period of decompensation would be expected to last.  (Tr. at 381, 382.)  Dr.

Cohen stated that Ms. Cohen decompensated during the relevant period under

adjudication, but estimated that it probably lasted for around two weeks, maybe longer.

(Tr. at 382.)

Prior to the accident on June 24, 1978, Ms. Cohen had been an early childhood

education teacher with eight years of experience.  (Tr. at 19.)  However, after the

accident, she never returned to work.   Ms. Cohen's husband, Alan Cohen, is a licensed

psychologist for the school district of Philadelphia.  (Tr. at 423.)  He observed Ms. Cohen

since the day of the accident and noted that she fell into a state of major, severe

depression and was physically unable to perform a host of activities that she had been

previously able to do.  (Tr. at 423, 427.)  He also noted that her condition has not

improved over the years.  (Tr. at 423.)

**III.  Procedural History**

In October of 1992, Ms. Cohen filed a claim for a Period of Disability and

Disability Insurance Benefits ("DIB") alleging a disability as of June 24, 1978. (Tr. at

15.)  This 1992 claim was denied upon initial determination on March 11, 1993. (Tr. at

33-35.)  Ms. Cohen did not file an appeal or request for reconsideration from that initial

denial. (See Pl. Mem. at 1.)

On March 22, 2000, Ms. Cohen formally filed her current DIB application alleging

a disability onset date of June 24, 1978.  (Tr. at 15, 80.)  After the current application was

denied upon initial determination on March 31, 2000, claimant's counsel entered an

appearance and requested reconsideration of the denial and reopening of the 1992 DIB

claim. (Tr. at 33-39.)  Ms. Cohen's counsel also amended the alleged date of disability

onset in the current application from June 24, 1978 to August 14, 1981. (Tr. at 15.)  The

current application was then denied again upon reconsideration, and Ms. Cohen filed a

request for a hearing. (Tr. at  41-44.)

After the administrative hearing, the Administrative Law Judge ("ALJ") dismissed

the current DIB claim under the doctrine of res judicata.  The ALJ's March 27, 2003

order of dismissal found that the current application involved the same facts and issues

which were decided in the March 11, 1993 determination of claimant's 1992 DIB claim,

and therefore, res judicata applied. (Tr. at 29.)  In addition, the ALJ found that there had

been no error on the face of the evidence on which the March 11, 1993 determination had

been made, so there were no grounds for reopening the 1992 DIB claim. (Tr. at 28-29.)

After the claimant filed a request for review of the ALJ's order of dismissal, the Appeals Council found that res judicata should not have been applied to this case. (Tr. at 31.)  Because the regulations relevant to some of the claimant's alleged mental impairments had substantively changed since the determination of the 1992 DIB claim, the prior decision on that 1992 claim did not preclude review of the claimant's current DIB application.  However, the Appeals Council specifically noted that although the ALJ should proceed to a decision on the merits of the current application, the revision in the mental impairment regulations did not "provide a basis for reopening the determination on the earlier claim." (Tr. at 31.)

Following the order of remand from the Appeals Council, the ALJ held a new hearing on February 26, 2004. (Tr. at 356-383.)  At this hearing, the ALJ heard testimony from the claimant, her husband (Alan Cohen), and Richard Cohen, M.D., the psychiatric medical expert with no relation to the claimant. (Tr. at 15.)  On April 30, 2004, the ALJ issued his decision denying disability benefits based on the current application. (Tr. at 12-21.)  Ms. Cohen appealed and the Appeals Council upheld the ALJ's decision as the final decision of the Commissioner of Social Security. (Tr. at 6.)  Ms. Cohen then filed this appeal in federal court.

For purposes of this appeal, the Court notes that pursuant to the requirements set forth in Section 216(I) of the Social Security Act, Ms. Cohen is insured for disability benefits through March 31, 1985. (See Tr. at 16.)  Therefore, the relevant period under adjudication for determining her disability is from August 14, 1981 to March 31, 1985. (Tr. at 16.)

**IV. The Commissioner's Decision**

When the Appeals Council denied plaintiff's last request for review, the

Commissioner adopted, as a final decision, the ALJ's ruling.  See Sims v. Apfel, 530 U.S.

103, 107 (2000) (citing 20 C.F.R. §§ 404.900(a)(4)-(5), 404.981, 422.210(a)).

Accordingly, a review of the Commissioner's denial of benefits necessarily entails a

review of the ALJ's decision.  Specifically, the ALJ made ten (10) findings:

1.   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through March 31, 1985.

2.   During the period of August 14, 1981 through March 31, 1985, the claimant did not engage in substantial gainful activity.

3.   During the period of August 14, 1981 through March 31, 1985, the claimant had an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b).  The record establishes that the claimant had fibromyalgia syndrome and a depressive disorder with anxiety.

4.   During the period of August 14, 1981 through March 31, 1985, these medically determinable impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.   The undersigned finds the claimant's allegations regarding her limitations during the period of August 14, 1981 through March 31, 1985 are not totally credible for the reasons set forth in the body of the decision.

6.   The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

7.   During the period of August 14, 1981 through March 31, 1985, the claimant had the residual functional capacity to perform light work.  She could lift and carry up to twenty pounds, and could sit, stand, and walk for six hours in an eight-hour day.  She retained the use of her extremities for pushing/pulling and for fine manipulation.  Her depressive disorder with anxiety did not preclude work tasks at the simple or detailed level.

8.      The claimant's past relevant work as teacher did not require the performance of work-related activities precluded by her residual functional capacity.  (20 CFR  § 404.1565).

9.      During the period of August 14, 1981 through March 31, 1985, the claimant's medically determinable fibromyalgia syndrome and depressive disorder with anxiety did not prevent her from performing her past relevant work.

10.     The claimant was not under a "disability" as defined in the Social Security Act, at any time during the period of August 14, 1981 through March 31, 1985 (20 CFR  § 404.1520 (e)).

## V.  Discussion

To establish a disability under the Social Security Act, a claimant must show that there is a "medically determinable basis for an impairment that prevents him from engaging in any substantial gainful activity for a statutory twelve-month period."  Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 545 (3d Cir. 2003) (citations and internal quotations omitted).  A claimant is unable to engage in substantial gainful activity only if his mental or physical impairments are so severe that he cannot do his previous work and, considering his age, education, and work experience, cannot "engage in any other kind of substantial gainful work which exists in the national economy. . . ."  42 U.S.C. § 423(d)(2)(A).

Requests for disability benefits under the Social Security Act are evaluated under a five step sequential process.  First, the Commissioner must ask if the claimant is engaged in substantial gainful activity, i.e., working.  20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I); Newell, 347 F.3d at 545 (citing Burnett v. Comm'r of Soc. Sec. Admin.,

220 F.3d 112, 118 (3d Cir. 2000)).  If working, the claimant is not disabled.  <u>Newell</u>, 347

F.3d at 545.  Second, the Commissioner must determine whether the claimant has a

severe impairment, defined as one that significantly limits physical or mental ability to do

basic work activities.  <u>Id.</u>  If the claimant does not have a severe impairment, then the

inquiry is at an end; however, if the claimant does have such an impairment, then the

Commissioner must move on to step three.  <u>Id.</u>  Step three requires the Commissioner to

determine whether the impairment is an enumerated impairment or is at least equal to an

enumerated impairment in Appendix 1 to Subpart P to Part 404.  <u>Id.</u> at 545-46.  If the

impairment is identifiable either as an enumerated one or an equivalent, then the claimant

is disabled and entitled to benefits.  <u>Id.</u>  If not, then the Commissioner has to determine

the claimant's residual functional capacity and decide whether that functional capacity

allows the claimant to do the work that the claimant did in the past.  <u>Newell</u>, 347 F.3d at

546.  If the claimant can perform his past relevant work given his newly found residual

functional capacity, then the claimant is not disabled; and if he cannot, then the

Commissioner must move to the fifth and final step.  <u>Id.</u>  Step five requires the

Commissioner to demonstrate that the claimant can perform some other work.  At the

fifth step, the Commissioner must demonstrate that the claimant can perform a job

existing in the national economy in significant numbers, consistent with claimant's age,

education, and work experience.  <u>Id.</u>

Here, the ALJ applied the appropriate sequential evaluation process, leaving this

Court to determine whether the ALJ properly applied the relevant legal standards and

whether his factual findings are supported by substantial evidence.  The finding at Step 1

that Cohen did not engage in substantial gainful activity during the relevant time period is undisputed and supported by the record.  Similarly, the finding of a severe impairment is also undisputed, as the record establishes that Cohen had fibromyalgia syndrome and a depressive disorder with anxiety. (See Tr. at 17, 20.)  Therefore, this Court will focus its analysis on the ALJ's determinations at Steps 3 and 4, as these are the primary analytical steps that the parties dispute.

*A.  Cohen's Alleged Points of Error*

Cohen makes two primary arguments to support her claim that the ALJ erred in failing to find her disabled.  First, Cohen argues that she not only meets the listing criteria for disability under 12:04(C),[2] but also that the medical expert's testimony verified that she suffered from that disability for a continuous twelve month period between August 14, 1981 (date of onset) and March 31, 1985 (date last insured).  In other words, she asserts that the ALJ's decision impermissibly mischaracterizes the testimony of the defendant's medical expert by stating that Dr. Cohen diagnosed a 12:04(C)(2) disability, but not for the requisite time period.  Second, Cohen argues that the ALJ erred in failing to consider the opinions of the claimant's husband and the medical experts who treated claimant after March 31, 1985.  Because there is little medical evidence from the relevant time period, Cohen argues that the ALJ should not have "ignored" the testimony of her husband and the post-1985 medical opinions. See Walton v. Halter, 243 F.3d 703 (3d Cir. 2001).

---

[2] The relevant listing criteria appear at 20 C.F.R. Pt. 404, Subpt. P, App. 1.

　　　　　　　1.　Testimony of Dr. Cohen

With respect to Ms. Cohen's first argument regarding the testimony of the medical

expert, the parties and the ALJ do not dispute whether Dr. Richard Cohen diagnosed

claimant with a psychiatric disability in the relevant time period.  Dr. Cohen testified that,

> I feel the patient has a major depressive disorder *in this period of time* with
> anhedonia, sleep disturbance, appetite disturbance, energy disturbance,
> decreased self-esteem and guilt, and suicide ideations and decreased
> concentration.  I feel there's an anxiety disorder NOS under 12.06 with –
> and a rule-out diagnosis of a number five, a post-traumatic stress disorder,
> and a rule-out diagnosis of 12.06, number 203, panic disorder with
> agoraphobia.  But there definitely is an anxiety disorder NOS under 12.06.
> I feel those are the psychiatric diagnoses, a 12.04, number one, and a 12.06,
> anxiety disorder NOS.

(Tr. at 380.)(emphasis added)  As the above-quoted testimony demonstrates, and as the

ALJ noted in his decision, Dr. Cohen found that the claimant suffered from a psychiatric

disability at some point in "this period of time."

To determine the severity of claimant's impairments during the relevant time

period, Dr. Cohen analyzed and applied the listing criteria under 12:04(B)[3] and

12:04(C)(2).[4]  In addressing the 12:04(B) criteria, Dr. Cohen testified that the claimant had

---

[3]Section 12:04(B) requires the finding of an affective disorder:
　　B.  Resulting in at least two of the following:
　　1.  Marked restriction of activities of daily living; or
　　2.  Marked difficulties in maintaining social functioning; or
　　3.  Marked difficulties in maintaining concentration, persistence, or pace; or
　　4.  Repeated episodes of decompensation, each of extended duration. 20 C.F.R.
　　Pt. 404, Subpt. P, App. 1.

[4] Section 12:04 (C)(2) requires the finding of an affective disorder with the following:
　　C.  Medically documented history of a chronic affective disorder of at least two
　　years duration that has caused more than a minimal limitation of ability to do
　　basic work activities, with symptoms or signs currently attenuated by medication

"moderate impairment" of activities of daily living, "marked impairment" of social functioning, and "moderate impairment" in maintaining concentration, persistence, and pace characterized by one "long period of decompensation."  (Tr. at 380-81.)   In other words, the claimant's impairments did not meet the criteria of 12:04(B) because: (1) she only had one period of decompensation as opposed to repeated episodes of decompensation, and (2) she had "marked" impairment in just one of the categories listed in 12:04(B).  However, Dr. Cohen went on to find that the claimant did satisfy the criteria under listing 12:04(C)(2) because she had "longstanding emotional problems of over two years and the stress of working would cause her to decompensate." (Tr. at 281.)

Nevertheless, nowhere in the hearing transcript does Dr. Cohen clarify whether the 12:04(C)(2) disability "in this period of time" persisted or was expected to persist for at least twelve months within the relevant time frame.  During cross-examination, instead of asking Dr. Cohen whether the claimant satisfied the 12:04(C)(2) criteria for a twelve month period between August 14 ,1981 and March 31, 1985, counsel focused on the 12:04(B)(4) requirements (i.e. the subsection that Dr. Cohen had ruled out in his diagnosis).  Rather than establishing under 12:04(C)(2) that for a twelve month period any "minimal increase in mental demands or change in environment would cause claimant to decompensate," counsel asked Dr. Cohen whether the one "long period of

---

or psychosocial support, and one of the following:
2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

decompensation" he found under 12:04(B)(4) persisted for a number of years.[5]

Unfortunately, the cross-examination of Dr. Cohen focused on establishing the existence

and duration of a 12:04(B) factor, when the real question that remained unanswered was

whether Dr. Cohen's 12:04(C)(2) diagnosis applied to a continuous twelve month period

between August 14, 1981 and March 31, 1985.

Therefore, the hearing transcript does not necessarily contradict the ALJ's

conclusion that  Dr. Cohen diagnosed a psychiatric disability within the relevant time

period, but not for a continuous twelve months.  To find a disability at step 3, claimant has

the burden of demonstrating that his impairments rise to the level of a listed disability for

a continuous twelve month period. See 42 U.S.C. §423(d)(1)(A); Rutherford v. Barnhart,

399 F.3d 546, 551 (3d. Cir. 2005).  Claimant's reliance on Dr. Cohen's testimony  to

satisfy that burden is inadequate because Dr. Cohen's testimony does not confirm whether

the impairments underlying his 12:04(C)(2) diagnosis "in this period of time" persisted

for the requisite twelve month duration.  On remand, the parties and the ALJ will have the

opportunity to obtain a clear medical opinion from a testifying expert  regarding whether

the claimant suffered from a listed disability for a continuous twelve month period

between August 14, 1981 and March 31, 1985.

    2. Testimony of Claimant's Husband and Opinions of Other Treating
       Physicians

Cohen's second argument on appeal pertains to the ALJ's alleged disregard for her

---

[5] In response to counsel's inquiries regarding the length of the one "long period of decompensation," Dr. Cohen could only estimate that the decompensation period lasted for "two weeks and maybe longer." (Tr. at 382.)

husband's testimony and the opinions of physicians who treated her at times outside the relevant period.  Specifically, Cohen contends that the ALJ violated Third Circuit precedents by disregarding the opinions of her husband and various treating physicians, and instead, resorting to his own "lay speculation" to determine disability status.

Before discussing the ALJ's handling of the medical opinions of certain treating physicians, this Court notes that the ALJ did not impermissibly "ignore" the testimony of the claimant's husband. See Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000) (recognizing the ALJ's duty to address non-medical evidence such as the testimony of a claimant's spouse).  In his decision, the ALJ specifically considers and references the husband's testimony that he had to help care for the couple's children because his wife was too weak to lift them.  (Tr. at 18.)  Although the claimant's brief highlights the fact that her husband is a psychologist, the claimant was never her husband's patient. Furthermore, because the claimant's husband had a substantial personal interest in the outcome of these proceedings, the ALJ noted at the hearing that he was not an objective medical expert in this case. (Tr. at 359.)  Thus, while the husband's testimony was properly considered as lay evidence, his opinions were not considered as those of a treating physician.

In contrast, the ALJ should accord a treating physician's reports great weight, particularly when their opinions reflect expert judgment based on a prolonged period of observation of the patient's condition. Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000); Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999); Rocco v. Heckler, 826 F.2d

1348, 1350 (3d Cir. 1987).  In choosing to reject a treating physician's opinion that a claimant is disabled, the ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion. Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429.

In Walton, the Third Circuit elaborated on these rules as they apply to cases where (1) the nature of the disability makes it difficult to pinpoint an onset date, and (2) there is little medical evidence from the relevant time period. See Walton v. Halter, 243 F.3d 703, 710 (3d Cir. 2001).  Under those circumstances, even when a treating physician bases his medical opinion on information obtained years later from the claimant or other lay persons with knowledge, the ALJ should not disregard that opinion solely on the basis that it did not derive from personal observation of the claimant during the relevant time period. Id. Where there is scant medical evidence from the relevant time period and no clear, medical opinion based on personal, contemporaneous observation, the ALJ should have the benefit of expert medical advice based on the best available data without regard to its source. Id.

The facts of the present case are sufficiently similar to the facts of Walton to warrant application of the Walton rule regarding the opinions of treating physicians.  In Walton, the claimant filed an application for disability benefits in 1992 based upon his bipolar disorder/manic depression. Id. at 705.   To prove entitlement to benefits, however, he had to demonstrate an onset date prior to his 22 birthday, which was over twenty years earlier on June 13, 1966. Id.  At the time of Walton's application, there were virtually no

available medical records from the relevant time period. Walton, 243 F.3d at 705-06. Instead, Walton tendered opinion letters, authored in the 1990s, from various physicians who had treated him over the years. Id. at 707.  The court found that under these circumstances the ALJ could not reject the opinion of a treating physician just because he did not personally observe the claimant during the relevant time period.  Id. at 710.

Like Walton, the claimant in the present case alleges a psychiatric disability with an alleged onset that dates back over twenty years.  In addition, the record in this case contains very little psychiatric medical evidence from the relevant time period.  Although there are a few letters and psychiatric progress notes for the months leading up to the alleged onset date, most of the psychiatric records from the relevant time period have been destroyed or are otherwise missing from the record. (See Tr. at 159-62.)  Furthermore, as the ALJ notes in his decision, the few contemporaneous records that are available do not contain a full explanation of the treating physician's observations/objective findings as they pertain to relevant disability criteria. (See Tr. at 19.)  Given these factual similarities between Walton and the present claimant's case, the Court will apply the Walton rule regarding consideration of medical opinions based on information gathered by a treating physician after the relevant time period.

Here, the ALJ violated the principles announced in both Walton and Morales when he rejected Dr. Goldman's retrospective medical assessment[6] solely because Goldman

_____

[6] This Court focuses on Dr. Goldman's medical opinion because it explicitly states that it pertains to the claimant's status during the relevant time period.  Much of the other medical evidence post-dating March 1985 pertains primarily to the claimant's status after the date last insured.  As a result, those records have limited relevance to the claimant's disability status

"first treated claimant in July 1993, more than eight years after the close of the relevant

period." (See Tr. at 17.)  Dr. Goldman's report states that the claimant could not perform

any gainful employment both before and after March 31, 1985. (Tr. at 351-52.)  However,

instead of rejecting that medical opinion on the basis of contradictory medical evidence,

the ALJ disregarded Dr. Goldman's opinion solely because it derived from information

obtained after the expiration of the relevant period. (Tr. at 17.) Although he rejected Dr.

Goldman's medical assessments outright, the ALJ did not discuss or explain whether the

medical evidence he relied upon contradicted Dr. Goldman's report, and if so, how he

would reconcile that conflict.  See Cotter v. Harris, 650 F.2d 481, 482 (3d Cir. 1981)

(noting that an ALJ must provide some explanation of why he has rejected probative

evidence which would have suggested a contrary disposition); see also Walton, 263 F.3d

at 710 (finding that when a clear medical opinion based on contemporaneous observation

is unavailable, the ALJ could not reject a treating physician's opinion solely on the basis

that the opinion relied upon information obtained from the claimant after the insured

period).

Rather, while ignoring Goldman's retrospective assessment solely because it was

made after the date last insured, the ALJ focused his analysis on three short notes from

Dr. Margolis. (See Tr. at 159-62.)   Those notes all date back to the nine month period

during the time period in question. See Jones v. Barnhart, No. Civ. A. 03-6660, 2005 WL
2033383, at *6 (E.D. Pa. Aug. 23, 2005) (slip opinion) (noting that a medical evaluation that
occurs after the date last insured is not probative evidence if it does not relate back to plaintiff's
mental status during the insured period); see also King v. Sec'y of Health & Human Servs., 896
F.2d 204, 205-06 (6th Cir. 1990) (stating that post-expiration evidence must relate back to the
claimant's condition prior to the expiration of her date last insured).

preceding the alleged date of onset, and together they establish that:

1.  Claimant suffered from severe neurotic depression with phobias and anxiety;

2.  Claimant attended psychotherapy four times a week;

3.  Claimant had symptoms of severe insomnia, crying, loss of appetite, transient suicidal thoughts, difficulty in concentrating, irrational guilt and shame;

4.  Claimant was not currently on medication for her psychiatric problems;

5.  Dr. Margolis thought claimant was making progress; and

6.  Dr. Margolis opined that claimant could not work or perform the duties of teacher.

(Tr. at 159-62.)  Because these few surviving notes did not contain more detailed findings, the ALJ inferred that the claimant's psychiatric condition was under control.  (See Tr. at 19.)   However, it is presumably this lack of clear, objective findings based on contemporaneous observation that led the Walton court to say that the factfinder should not disregard a subsequent treating physician's opinion in situations where the court must infer an onset date for a progressive mental illness. See Walton, 263 F.3d at 710.  The rationale seems even more persuasive here, not only because the rejected medical opinion from Dr. Goldman contains specific findings related to the pertinent mental impairments during the relevant time period, but also because Dr. Goldman consulted Dr. Margolis (the contemporaneous treating psychiatrist) when he made his retrospective assessment. (See Tr. at 351.)

Therefore, this Court finds that the ALJ erred in rejecting Dr. Goldman's medical assessment solely because it derived from information gathered after the relevant time period.  On remand, the ALJ should re-examine the medical evidence, and in accordance

with <u>Morales</u> and <u>Walton</u>, should consider the treating physician's opinions which relate back to the insured period.  In circumstances like these, the ALJ should only reject such opinions on the basis of contradictory medical evidence.

      3.  <u>ALJ's Inferences Regarding Claimant's Residual Functional Capacity</u>

Regardless of whether  the ALJ properly applied Third Circuit law, the ALJ's factual conclusions at step 4 impermissibly depend upon the ALJ's speculation and lay inferences, rather than substantial evidence. <u>Kent</u>, 710 F.2d at 115; <u>see</u> <u>Morales</u>, 225 F.3d at 317; <u>Plummer</u>, 186 F.3d at 429.  The ALJ's lay inferences pertaining to the claimant's ability to perform her past work relate both to her psychiatric problems as well as her physical capabilities.

In his assessment of the extent to which claimant's psychiatric problems affected her ability to work, the ALJ drew several conclusions that do not find substantial support in the medical record.  The ALJ substituted his own opinion for that of the treating psychiatrist when he concluded,

> Her frequent, almost daily, [psychotherapy] sessions demonstrate she was able to maintain a regular schedule and persist in tasks during this period . . . . Although Dr. Margolis opined that she was unable to work as a teacher, these opinions were tentative in nature, and not well supported.  Given the lack of medication and the absence of objective findings, the undersigned concludes that the claimant successfully managed her depressive disorder.  During this period, her psychological limitations prevented her from performing complex tasks, but did not preclude simple or detailed tasks.

First, Dr. Margolis unequivocally stated in 1981 that the claimant was "unable to perform the duties of a teacher," yet the ALJ dismisses his opinion as tentative and draws his own

contrary conclusion that Ms. Cohen could in fact perform simple or detailed tasks and

return to work as a teacher. (See Tr. at 159, 161.)  Essentially, the same evidence that the

ALJ relies on to say that Ms. Cohen was not disabled expressly states just the opposite--

namely, that her impairments prevented her from returning to work.  Second, the medical

records indicate that the reason claimant was not taking medication was not because she

was "successfully managing" her depressive disorder, but rather because Dr. Margolis

feared the medication would interfere with the therapy she was simultaneously receiving.

(Tr. at 345.)  Third, the ALJ's conclusion that the lack of objective findings in Dr.

Margolis' notes meant that her symptoms were successfully managed is not only

undermined by Dr. Margolis' statement that her psychiatric problems prevented her from

working, but is also undercut by the fact that virtually all of Dr. Margolis' records have

been destroyed.  In other words, it is unreasonable to infer that the claimant's symptoms

did not reach a disabling level just because the three surviving notes from Dr. Margolis'

files did not happen to contain an assessment of objective, disability criteria.  Fourth, the

ALJ's inference that the claimant's psychotherapy schedule suggested she could perform

tasks and maintain a routine is flawed. (See Tr. at 18.)   Just because the claimant could

go to therapy four times a week does not mean that she could persist in the tasks and

maintain the routine of a school teacher for at least six hours a day, five days a week.  See

Morales, 225 F.3d at 319 (3d Cir. 2000) (noting that the work environment is completely

different from home, such that an observation that a claimant's mental impairments are

stable with treatment does not support the conclusion that the claimant can return to

work).

Similarly, the ALJ made several unsupported lay inferences in determining the extent to which claimant's physical limitations affected her ability to return to past work during the relevant time period.  The ALJ concludes,

> "[H]er fibromyalgia symptoms did not preclude sitting, standing, walking for six hours in an eight-hour day, or preclude the use of her extremities for pushing/pulling or fine manipulation."

The ALJ fails to point to a medical opinion which supports these findings.  The notes of the treating physician during the relevant time period diagnose the claimant with primary fibromyalgia syndrome, prescribe medication, and note symptoms of burning sensation, muscle aches, and an unbearable feeling like her whole body was twisted. (Tr. at 156-57.) Moreover, the chiropractic notes from the year before the alleged onset date state that "the patient is totally disabled and is unable to be employed because of her back condition." (Tr. at 175.)  Further, the chiropractic note from May 1981 states that claimant had experienced no relief since she began treatment for severe pain, and that her "prognosis was poor." (Tr. at 177.)  Given this medical evidence relating to the claimant's physical status during and just before the relevant time period, the ALJ's determination that she could "sit, stand, or walk for six hours a day" or "use her extremities for pushing/pulling or fine manipulation" appears unsupported by substantial evidence in the record.[7]

Based largely upon these lay speculations, the ALJ determined that the claimant retained the residual functional capacity to perform light work. (Tr. at 19.)  In turn,

---

[7]Dr. Greenberg also noted in a letter dated January 24, 2000 that "Mrs. Cohen has been unable to work due to her severe fibromyalgia.  As per her history, Mrs. Cohen has been unable to work since her bicycle accident in June of 1978." (Tr. at 342.)

because claimant's former job as a teacher fell within the light exertional category, the ALJ concluded that she could have returned to her past work during the relevant time period. (Tr. at 19.)  However, the ALJ's own lay inferences and medical judgments regarding a claimant's physical and mental capabilities do not constitute substantial evidence sufficient to support the ALJ's conclusion. See Kent, 710 F.2d at 115; Gober v. Matthews, 574 F.2d 772 (3d Cir. 1978); Schaaf v. Matthews, 574 F.2d 157 (3d Cir. 1978). Therefore, this court will reverse and remand the case with instructions that the ALJ re-evaluate the claimant's residual functional capacity based on the medical evidence available and conduct a step 5 analysis, if necessary.

### B.  Claimant's 1992 DIB Claim

In addition to claimant's arguments regarding the ALJ's disability determinations on her current application, Ms. Cohen also argues that her prior 1992 DIB Claim should be reinstated.  Specifically, Cohen argues that the initial determination on her 1992 DIB claim failed to consider the medical records regarding Cohen's mental impairments, and therefore, the claim should be reopened to consider all relevant evidence.

The rules regarding the reopening of prior disability determinations are governed by regulations rather than the Social Security Act.  See Califano v. Sanders, 430 U.S. 99, 108 (1977).   Under 20 C.F.R. §404.988(c), a prior determination or decision may be reopened at any time, if that prior determination was the product of fraud or similar fault. 20 C.F.R. §§404.988(c), 416.1488(c).  "Similar fault" exists when a person either knowingly makes an incorrect or incomplete statement that is material to the

determination, or knowingly conceals information that is material to the determination.
See Britton v. Sullivan, 908 F.2d 328, 330 (8th Cir. 1990) (citing SSA Program
Operations Manual § GN 04020.010).

Here, Ms. Cohen argues that the March 11, 1993 determination dismissing her
1992 DIB claim should be reopened because that determination allegedly failed to address
her mental impairment--a failure which claimant contends constituted similar fault under
Section 404.988(c).  Although the ALJ did not specifically address the reopening issue in
his April 2004 decision, he did specifically refuse to reopen the 1992 claim in his first
opinion dismissing claimant's current application. (Tr. at 29.)  The Appeals Council
thereafter reversed the ALJ's order dismissing the current claim because a change in the
relevant regulations precluded application of res judicata; however, the Appeals Council
specifically noted that the "revision in the regulations does not provide a basis for
reopening the determination on the earlier claim." (Tr. at 31.)

In any event, the Court does not have jurisdiction to review the decision not to
reopen claimant's 1992 DIB claim.   Judicial review is permitted only where there has
been a final decision of the Commissioner made after a hearing. Califano, 430 U.S. at
107-08; Whittaker v. Comm'r of Soc. Sec., 305 F. Supp. 430, 441 (2d Cir. 2004); Penner
v. Schweiker, 701 F.2d 256, 260 (3d Cir. 1983).   Here, claimant did not appeal his 1992
application beyond the initial determination level. (See Pl. Mem. at 1.)  In other words,
because a "final decision of the Commissioner after a hearing" never occurred with
respect to the initial 1992 application, this Court does not have jurisdiction to review the

determination not to reopen the 1992 claim.

Alternatively, the court does not have subject matter jurisdiction to review a Commissioner's refusal to reopen a prior decision absent a colorable constitutional claim. <u>Califano</u>, 430 U.S. at 109.  In the present case, Cohen does not present any constitutional grounds to support her reopening argument, thus precluding this Court's subject matter jurisdiction.

Altogether, the Court does not have subject matter jurisdiction to review the refusal to reopen claimant's 1992 DIB claim because: (1) a final decision of the Commissioner after a hearing never occurred with respect to the 1992 application, and (2) claimant did not raise a colorable constitutional claim in support of its argument for reopening.

## VI.  Conclusion

Based on the foregoing, the decision of the Commissioner will be reversed and remanded for proceedings consistent with this opinion.  The accompanying Order shall issue today.

Dated:    11-17-05                                                s/ Robert B. Kugler
_____ROBERT B. KUGLER
                                                                     United States District Judge